## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| RAJESH PENNETI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-00525-E |
| | § | |
| L&T TECHNOLOGY SERVICES LTD and | § | |
| SONIM TECHNOLOGIES, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant L&T Technology Services Ltd. (LTTS)'s motion for summary judgment (LTTS's Motion), which seeks to dismiss all of Plaintiff Rajesh Penneti's claims against it. Penneti has responded to the summary judgment, and LTTS has replied. For the reasons enumerated below, the Court GRANTS LTTS's Motion

### I.    BACKGROUND

#### A.  Penneti's Work at LTTS and FMLA Notice

LTTS is a global company headquartered in India that provides IT management and consulting services; LTTS has 1,600 employees in North America and 16,000 employees worldwide. (ECF No. 56 at 17-18). Since 2014, Penneti worked at LTTS. (ECF No. 56 at 4). In 2017, Penneti was treated for depression. (ECF No. 56 at 4). In 2019, Penneti sought treatment from a psychiatrist who diagnosed him with major depressive disorder and general anxiety disorder. (ECF No. 56 at 4). Beginning in September 2019, Penneti worked on a project for Defendant Sonim Technologies, Inc. (Sonim), as a Senior Field Test Engineer. (ECF No. 56 at 4).

In November 2019, Penneti's physician "recommended [he] take leave from work." (ECF No. 56 at 5). On November 26, 2019, Penneti emailed LTTS: "I like to take leave under FMLA. Please let me know the procedure for this as soon as possible." (ECF No. 56 at 30).[1] On December 2, 2019, LTTS human resources employee Merica Quan responded "[k]indly confirm the reason for your FMLA request and the dates you would be going on leave" and directed Penneti to the employee handbook. (ECF No. 56 at 29). On December 7, 2019, Penneti emailed LTTS:

> This is for my mental health – depression and related conditions like exhaustion, loss of appetite which are starting to effect my work.
> Need to discuss with my psychiatrist what are the exact DSM codes for my condition, what is the best way to take leaves [sic] to recover from my condition ( [sic] intermittent or extended leave) and how long would it be required.
> I have an upcoming appointment on Dec 4th and in case you need my doctor to fill up any forms, please send them to me before Dec 4th.

(ECF No. 56 at 28). On December 11, 2019, Penneti emailed Quan, Srishti Tewari (another LTTS human resources employee), and others at LTTS a completed FMLA form and "[r]equested leave: intermittent for 3 months, 2 days of leave every week to take 4 consecutive days of rest." (ECF No. 56 at 39). Under the section labeled "Estimate the part-time or reduced work schedule the employee needs, if any," Penneti wrote:



(ECF No. 56 at 46). Penneti requested for intermittent leave for a three month period—to work three days a week with two consecutive days off from work. (ECF No. 56 at 39, 46).

---

[1] "FMLA" refers to the Family Medical Leave Act.

MEMORANDUM OPINION AND ORDER                                    Page **2** of **28**

On December 11, 2019, LTTS management emailed Pradip Bonde, who was Penneti's supervisor at LTTS, "[t]his is not going to be acceptable by Sonim. Please find a way out." (ECF No. 56 at 90). On December 12, 2019, Penneti's supervisor from LTTS on the Sonim project Amarjit Prasad emailed Tewari:

> We got to know from Rajesh Penneti that he has applied for FMLA.
> Please let us know if he is eligible and 2 days a week leave is even possible coz [sic] it will badly affect our delivery.
> Can you try to talk him out for long leave instead of intermittent leaves under FMLA. [sic]

(ECF No. 56 at 91). In his declaration, Penneti testifies:

> In December 2019, I discussed my leave with Amarjit Prasad. Prasad asked me to consider taking three to four weeks leave instead of the two days per week that my physician recommended.

(ECF No. 56 at 6).

On December 16, 2019, Tewari requested a doctor's note from Penneti, which indicated Penneti's work restrictions and the start and end date of the restrictions. (ECF No. 56 at 54). On December 25, 2019, Penneti submitted the doctor's note, which indicated restrictions from December 16, 2019 to March 6, 2020. (ECF No. 56 at 51, 58). On January 3, 2020, Bonde emailed Tewari "[i]t will be difficult for [Penneti] to work in this manner. Client will not accept it. Can we suggest him to go on leave for 2 to 3 weeks. [sic]." (ECF No. 56 at 92). On January 10, 2020, Penneti informed LTTS that he would take leave from January 13 to 14 of 2020; that same day, LTTS approved Penneti's intermittent leave request. (ECF No. 56 at 48-49). LTTS placed Penneti on intermittent leave from January 13, 2020 to March 16, 2020. (ECF No. 94 at 133). Thereafter, Penneti requested no other accommodation from LTTS. (ECF No. 44 at 37).

### B.  Penneti's Work Separation from the Sonim Project

On January 13, 2020, Bonde emailed Sonim's Test Manager Rajesekar Dhanasekaran the

following:

> Rajesh P who is working on SONIM assignment in Dallas is facing some medical
> issues, Doctor has suggested him to take some rest hence he has applied FMLA.
> Doctor has suggested him to take 2 days of leave every week for sometime. He will
> be taking Monday and Tuesday leave every week from today. Hope this if fine with
> you [sic]

(ECF No. 56 at 72). That same day, Dhanasekaran responded:

> We didn't get any information prior to this email and We are NOT okay with below
> proposal. We would request the engineer to continue his support till we find a
> replacement with KT.
> Also we are unhappy with things happening at FT which is affecting our "QA
> deliverables".

(ECF No. 56 at 72). Bonde proposed a plan to Sonim regarding Penneti's leave involving other

workers "to minimize the impact on project deliverable." (ECF No. 44 at 97). In Bonde's

declaration, he testified that that:

> Sonim advised me that the proposed schedule was not workable for the Sonim
> project which had critical milestones through March 2020. Sonim explained that
> each engineer on the project, including Plaintiff, was allocated new tasks on a daily
> basis and, as such, a three day a week schedule would lead to a 5 day waiting period
> between assignment and response for certain projects, thereby drastically impacting
> project delivery timing.

(ECF No. 44 at 94). On January 14, 2020, Dhanasekaran at Sonim removed Penneti from the

Sonim project, effective January 17, 2020. (ECF No. 56 at 71). Furthermore, on April 27, 2020,

Sonim "changed [its] internal [field test] strategy due to cost factor" and "close[d] all the [field

test] contracts at USA present on-going." (ECF No. 44 at 133).

### C.  Penneti's Work Separation from LTTS

After the assignment at Sonim ended, LTTS placed Penneti on a project named OMADM

until January 30, 2020. (ECF No. 56 at 8). Then, LTTS placed Penneti on an internal training

project in March 2020 wherein Penneti trained four employees on mobile field testing. (ECF No. 44 at 49; ECF No. 56 at 8). At all times (i) while Penneti was on his FMLA leave and (ii) during this internal training project assignment, Penneti received the same salary and was eligible for the same benefits he received while he had worked on the Sonim project. (ECF No. 44 at 49). On April 29, 2020, LTTS noticed Penneti that this internal training project would end on May 5, 2020. (ECF No. 44 at 90). The notice further explained:

> [Y]our last date of employment with L&T Technology Services will be processed as of May 13, 2020. During this notice period of 2 weeks we will be looking for other project/assignments internally with LTTS and if no suitable project is found, your last date of employment with L&T Technology Services will be processed as of May 13, 2020 and you will be removed from company payroll after this date.

(ECF No. 44 at 90). After this notice, LTTS attempted locate further assignment for Penneti. (ECF No. 44 at 94-95). LTTS was unable to locate a further assignment for Penneti, and LTTS terminated his employment on May 13, 2020. (ECF No. 44 at 95).

### D.  Procedural History

On March 8, 2021, Penneti filed his complaint, which asserts claims against LTTS for (i) disability discrimination under the Americans with Disabilities Act (ADA); (ii) disability discrimination under the Texas Commission on Human Rights Act (TCHRA); (iii) failure to accommodate disability under the ADA; (iv) failure to accommodate disability under the TCHRA; (v) interference with exercise of rights under the FMLA; and (vi) discrimination and retaliation under the FMLA. LTTS has moved for summary judgment on each of these claims. Having been fully briefed and for the reasons enumerated hereunder, the Court GRANTS LTTS's Motion, hereunder.

## II.   SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate when the pleadings and evidence on file show "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. A court must view all evidence and draw all reasonable inferences in the light most favorable to a party opposing a summary judgment motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). A court "may not make credibility determinations or weigh the evidence" in ruling on the motion. *Reeves*, 530 U.S. at 150; *Anderson*, 477 U.S. at 254-55. Moreover, the evidence the non-movant provides must raise "more than ... some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The evidence must be such that a jury could reasonably find in the non-movant's favor. *Anderson*, 477 U.S. at 248. If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

The moving party bears the initial burden of showing the court there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party with the burden of proof on an issue "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted). When, as here, a nonmovant bears the burden of proof, the movant may demonstrate it is entitled to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing there is no evidence to support an essential element of the nonmovant's claim or affirmative

defense. *Celotex*, 477 U.S. at 322–25 (emphasis added). There is "no genuine issue as to any material fact [if] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Once the movant has made this showing, the burden shifts to the nonmovant to establish there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Celotex*, 477 U.S. at 324. "[C]onclusory allegations, speculation, and unsubstantiated assertions" will not satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1). A court "resolve[s] factual controversies in favor of a nonmoving party . . . only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

"A party opposing such a summary judgment motion may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing Anderson, 477 U.S. at 255–57). The Fifth Circuit has explained:

> The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. . . . "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992).

*Ragas*, 136 F.3d at 458. Regarding assertions of fact, Federal Rule of Civil Procedure 56 states:

> [i]f a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion [and] (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]

---

Fed. R. Civ. P. 56(e)(2)-(3).

### III.   ANALYTICAL FRAMEWORKS

Because several of Penneti's claims allege discrimination or retaliation, the Court provides

the following *McDonnell Douglas* burden-shifting framework analyses, which are common to

employment discrimination and retaliation claims. *See McDonnell Douglas Corp. v. Green,* 411

U.S. 792 (1973); *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) ("To succeed

on a claim of intentional discrimination under Title VII, Section 1983, or Section 1981, a plaintiff

must first prove a prima facie case of discrimination.") (collecting cases); *E.E.O.C. v. LHC Grp.,*

*Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (addressing ADA discrimination claim under burden-

shifting framework); *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 520 (5th Cir. 2021) ("Because

the Texas statute parallels the ADA, we treat such claims similarly.");[2] *Mauder v. Metro. Transit*

*Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006) (addressing FMLA retaliation under

burden-shifting framework)

### A.  Employment Discrimination

"A plaintiff can prove a claim of intentional discrimination by either direct or

circumstantial evidence." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000);

*see, e.g.*, *Gaalla v. Brown*, 460 F. App'x 469, 479 (5th Cir. 2012) (addressing racial

discrimination). Regarding direct evidence, the Fifth Circuit has explained:

---

[2] The Texas Supreme Court has explained that claims asserted under the TCHRA should be analyzed in the same manner as its federal analogues. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633–34 (Tex. 2012) (citations omitted) ("Because one of the purposed of the TCHRA is to 'provide for the execution of the policies of Title VII of the Civil Rights Act of 1964,' we have consistently held that those analogous federal statutes and the cases interpreting them guide our reading of the TCHRA."); *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003) (noting the *McDonnell Douglas* burden shifting analysis applies to TCHRA disability discrimination cases); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004) (discussing disability discrimination under the TCHRA as parallel to the ADA).

---

> Direct evidence [of discriminatory intent] is evidence which, if believed, proves the fact without inference or presumption. . . . It includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action.

*Gaalla*, 460 F. App'x at 479 (internal quotations omitted). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell*, 235 F.3d at 222. Circumstantial evidence includes statements that merely suggest discriminatory motive or require the fact finder to draw an inference as to whether the comment is probative of an employer's discriminatory animus. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896-98 (5th Cir. 2002), *cert. denied,* 539 U.S. 926 (2003). The Fifth Circuit has explained the three-step *McDonnell Douglas* framework as follows:

> Under that framework, [a plaintiff] must make out a prima facie case of discrimination. *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021). If she succeeds, [a defending employer] must respond with a "legitimate, nondiscriminatory reason" for terminating [the plaintiff]. *Id.* at 282. Then the burden shifts back to [the plaintiff], who must counter with substantial evidence that [the defending employer's] proffered reason is pretextual. *Id.*

*Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022). The second step of the *McDonnell Douglas* framework requires an employer's *production* of a legitimate, nondiscriminatory reason for terminating a plaintiff, but this second step "can involve no credibility assessment." *Reeves*, 530 U.S. 133, 142 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).[3] Regarding the third step of the *McDonnell Douglas* framework, "the

---

[3] Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

plaintiff can rely on evidence that the employer's reasons were a pretext for unlawful discrimination." *Russell*, 235 F.3d at 222 (citing *McDonnell Douglas*, 411 U.S. at 804).

### B.  Employment Retaliation

"A plaintiff may prove a retaliation claim through direct or circumstantial evidence." *Jones v. Overnite Transp. Co.*, 212 F. App'x 268, 275 (5th Cir. 2006). "Without direct evidence, the plaintiff must establish his cause of action using circumstantial evidence and the *McDonnell Douglas* burden-shifting framework," discussed above. *Jones*, 212 F. App'x at 275. "If the plaintiff establishes a prima facie case, then the defendant must show a non-retaliatory, legitimate reason for the adverse action." Again, this second step of the *McDonnell Douglas* framework requires an employer to produce evidence of a non-retaliatory, legitimate reason for the adverse action—but requires no burden of persuasion. *See Jones*, 212 F. App'x at 275; *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002) ("We agree that [t]he ultimate burden of persuading the trier of fact that the defendant [retaliated] against the plaintiff remains at all times with the plaintiff.") (internal quotation omitted). "Once the defendant meets this burden, the plaintiff must in turn offer evidence to create a genuine issue of material fact that the defendant's reason is not true, but is instead a pretext for discrimination." *Jones*, 212 F. App'x at 275; *see, e.g.*, *Gee*, 289 F.3d at 345 (discussing the same).

### IV.    PENNETI'S DISABILITY DISCRIMINATION CLAIMS (ADA AND TCHRA)

"The ADA prohibits an employer from discriminating against a 'qualified individual with a disability on the basis of that disability.'" *LHC Grp., Inc.*, 773 F.3d at 694 (citing 42 U.S.C. § 12112(a)). Furthermore, "Texas law prohibits employers from discriminating against their employees based on disability." *Campos*, 10 F.4th at 520 (citing Tex. Lab. Code § 21.051(1)). As pleaded, the ADA discrimination analysis applies equally to Penneti's TCHRA discrimination

---

MEMORANDUM OPINION AND ORDER                                         Page **10** of **28**

claim, so the Court analyzes each of these claims together. *See Campos*, 10 F.4th at 520; *see, e.g.*, *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 578 n.16 (5th Cir. 2020) (collecting cases).

As discussed above "[a] plaintiff can prove discrimination through direct or circumstantial evidence." *Campos*, 10 F.4th at 520. "When circumstantial evidence is the basis for the claim, the *McDonnell Douglas* burden-shifting framework applies." *Campos*, 10 F.4th at 520. Under the first step of the *McDonnell Douglas* framework, the Fifth Circuit has explained:

> the employee has the burden to prove the prima facie elements: "**(1)** that he has a disability; **(2)** that he was qualified for the job; [and] **(3)** that he was subject to an adverse employment decision on account of his disability." *Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017) (alteration in original).

*Campos*, 10 F.4th at 521 (emphasis added in bold). "Adverse employment decisions are ultimate employment decisions such as hiring, granting leave, discharging, promoting, ... compensating, or demoting." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 470 (5th Cir. 2021) (internal quotation omitted).[4]

LTTS contends that Penneti's disability discrimination claims fail as he cannot meet his burden under the *McDonnell Douglas* burden-shifting standard because there is no evidence of the third element—that Penneti was subject to an adverse employment decision on account of his disability. Penneti responds with four alleged adverse employment decisions as based on his disability—(i) removal from the Sonim project; (ii) transfer to an internal training project; (iii) a negative performance review; and (iv) his ultimate termination from LTTS. Penneti first responds that direct evidence exists of disability discrimination in relation to each of these four alleged adverse employment actions, but Penneti fails to cite any evidence in support. (ECF No. 55 at 22-

---

[4] Courts use the terms "adverse employment action" and "adverse employment decision" interchangeably. *See, e.g., Thompson v. Microsoft Corp.*, 2 F.4th 460, 470 (5th Cir. 2021); *Pegram*, 361 F.3d at 282 (5th Cir. 2004) ("an adverse employment action consists of ultimate employment decisions such as hiring, granting leave, promoting, and compensating") (internal quotation omitted).

23). The Court has further found no direct evidence of disability discrimination in the record. The Court concludes there is no direct evidence of disability discrimination in the record. Thus, the Court next determines whether circumstantial evidence exists of LTTS's adverse employment decision on account of Penneti's disability. *See Campos*, 10 F.4th at 521.

## A. Penneti's Removal from the Sonim Project and Transfer to Internal Training Project

The Parties dispute whether Penneti's removal from the Sonim project and transfer to an internal training project constituted adverse employment actions. Penneti refers the Court to no evidence as to how or why his removal from the Sonim project constituted an adverse employment action, and the Court has found none. Instead, the record shows LTTS granted Penneti's request to work three consecutive days a week and be off from work two consecutive days a week; Sonim's corporate representative testified:

> [Question]: Is there any reason why Mr. Penneti would not be able to work three days per week on the Sonim project?
> [Answer]: Sonim required resources working five days a week.

(ECF No. 56 at 86).[5] Nonetheless, after removal from the Sonim project, the record shows Penneti continued to receive the same compensation and benefits as when he worked at Sonim. Assuming *arguendo* that Penneti's removal from the Sonim project constituted a reassignment to a vacant

---

[5] Sonim's corporate representative next speculates without personal knowledge whether a working combination of Penneti and other LTTS employees would have permitted Penneti to continue working three days a week on the Sonim project:

> [Question]: So if LTTS had proposed Mr. Penneti three days and another resources two days, Sonim would have been able to accommodate that request?

> [Answer]: Again, I was not the one who was making that decision, so - - I mean, that's a hypothetical statement[]

(ECF No. 56 at 86). Such evidence is not competent summary judgment evidence. *See TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002).

---

position at LTTS, the record shows LTTS granted Penneti's requested reasonable accommodation. "Under the ADA, reassignment to a vacant position can be a reasonable accommodation." *Gonzales v. City of New Braunfels, Tex.*, 176 F.3d 834, 838 (5th Cir. 1999).

Next, in addressing his reassignment to an internal training project, Penneti refers the Court to the following from *Alvarado v. Texas Rangers*:

> [t]o be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves *objectively worse*—such as being less prestigious or less interesting or providing less room for advancement.

492 F.3d 605, 613 (5th Cir. 2007) (internal quotation omitted, emphasis added); (*see* ECF No. 55 at 22). But, Penneti directs the Court to no evidence that the internal training project constituted an "objectively worse" position—that this internal training project position was less prestigious, less interesting, or provided less room for advancement. And, the Court has found no such corresponding evidence.

Penneti next argues:

> LTTS does not dispute that it is vital for an employee/resource to be allocated to a *revenue-generating project*. LTTS has even confirmed that employees who are not on a *revenue-generating project* for a period of time will be terminated. Thus, by its own admission, removing Penneti from the Sonim project and placing him on an internal project is an adverse employment action Furthermore, it was LTTS' discriminatory actions of removing Penneti from the Sonim project that led to his termination.

(ECF No. 55 at 22-23) (emphasis added). Again, Penneti cites no corresponding evidence in the record. And the Court has found no such supporting evidence in the record.[6] Assuming *arguendo* such evidence that an assignment to a non-"revenue-generating project" was less prestigious or

---

[6] Indeed, there is no evidence in the record that "LTTS . . . confirmed employees who are not on a *revenue-generating project* for a period of time will be terminated"; to the contrary, the record shows Penneti agreed he was terminated because he was "unassigned"—"not placed in a subsequent assignment" for "a particular period of time." (ECF No. 44 at 38-39).

desirable, the record shows—and it is undisputed—that Penneti kept the same salary and benefits as when he worked with Sonim. Otherwise, there is no evidence in the record of adverse changes in Penneti's work duties, compensation, or benefits. The Fifth Circuit explained:

> in cases where the evidence produces no objective showing of a loss in compensation, duties, or benefits, but rather solely establishes that a plaintiff was transferred from a prestigious and desirable position to another position, that evidence is insufficient to establish an adverse employment action. *See Serna v. City of San Antonio,* 244 F.3d 479, 485 (5th Cir. 2001).

*Pegram v. Honeywell, Inc.*, 361 F.3d 272, 283 (5th Cir. 2004). Thus, the record does not support Penneti's argument that assignment to an internal project constituted an adverse employment action.

### B.  Penneti's Negative Performance Review

Penneti next directs the Court to evidence of a negative performance review as an adverse employment action. However, the Fifth Circuit has explained that poor or negative performance reviews do not typically constitute an adverse employment action:

> Even if the [employee assistance plan] is characterized as a poor performance review, Welsh has failed to allege an adverse employment action. *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997) (holding that "disciplinary filings, supervisor's reprimands, and ... poor performance by the employee" do not constitute adverse employment actions), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345; *Douglas v. DynMcdermott Petroleum Operations, Co.*, 144 F.3d 364, 373 n.11 (5th Cir. 1998) (low performance ratings not considered adverse employment actions).

*Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 824–25 (5th Cir. 2019). Although Penneti avers the performance review occurred because of his medical leave, Penneti directs the Court to no supporting evidence, and the Court has found none.[7] To contrary, the record of the performance

---

[7] Penneti also argues that "he received a poor performance review making him ineligible for a promotion ***because of his disability***," but there is neither argument nor evidence that Penneti was—at any time— considered for or offered a promotion. (ECF No. 55 at 22) (emphasis in original). Penneti's pleadings do not discuss or allege a failure to promote. (*See* ECF No. 1). The Court notes generally that in the TCHRA context, "a decision made by an employer that only limits an employee's opportunities for promotion or

review contains no discussion whatsoever regarding any health conditions or medical leave. (ECF No. 56 at 104-13).

Here, the record is devoid of evidence that Penneti's (i) removal from the Sonim project; (ii) transfer to an internal training project; or (iii) negative performance review constituted adverse employment decisions. Thus, the Court must conclude that these three employment actions did not constitute adverse employment actions.[8]

### C.  Penneti's Termination from LTTS

It is undisputed that Penneti's termination from LTTS constituted an adverse employment action. *See* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees[]").  LTTS argues there is no evidence that Penneti's termination occurred "on account of his disability." In response, Penneti appears to rely on the same general, unsupported evidentiary assertions discussed above regarding (i) his removal from the Sonim project; (ii) his transfer to an internal training project; and (iii) his negative performance review. However, no evidence in the record of these circumstances show any relation to Penneti's disability. That is, the record does not show these circumstances occurred "on account of" Penneti's depression, mental health, or related conditions discussed in the record (exhaustion and loss of appetite). (*See, e.g.*, ECF No. 56 at 28). Instead, the record shows LTTS attempted to secure further work for Penneti, but LTTS was not able to

---

lateral transfer does not qualify as an adverse employment action under Title VII." *Banks v. East Baton Rouge Parish School Board,* 320 F.3d 570, 575 (5th Cir.2003), *citing Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 878-80 (5th Cir. 1999) (explaining that an employer's refusal of an employee's request for a "purely lateral transfer" does not qualify as an adverse employment action under Title VII).

[8] Penneti generally avers throughout his briefing that he was "removed from the OMADM project because of his disability." (*See e.g.*, ECF No. 55 at 24). However, at no point does Penneti refer the Court to any corresponding evidence, and the Court has found no evidence in the record that shows any discriminatory or retaliatory animus in regards to Penneti's removal from the OMADM project.

---

secure further work for Penneti before the noticed termination date of May 13, 2020. (*See* ECF No. 44 at 101-31).

Thus, the record is devoid of evidence that Penneti's termination at LTTS occurred on account of his disability. Accordingly, the Court must conclude Penneti has not "prove[d] a prima facie case of discrimination" under the ADA or TCHRA for disability discrimination. *Owens*, 33 F.4th at 825; *see Campos*, 10 F.4th at 521. The Court GRANTS LTTS's motion for summary judgment as to Penneti's corresponding claims of disability discrimination under the ADA and TCHRA.

## V.    PENNETI'S FAILURE TO ACCOMMODATE CLAIMS (ADA AND TCHRA)

The ADA "requires an employer to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability[.]'" *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016) (quoting 42 U.S.C. § 12112(b)(5)(A)). To prevail on a failure-to-accommodate claim, the plaintiff must show "**(1)** [he] is a 'qualified individual with a disability;' **(2)** the disability and its consequential limitations were 'known' by the covered employer; and **(3)** the employer failed to make 'reasonable accommodations' for such known limitations." *Feist v. Louisiana, Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (emphasis added in bold). The Fifth Circuit has further explained:

> "An employee who needs an accommodation ... has the responsibility of informing [his] employer." *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009). Special words, like "reasonable accommodation," need not be uttered, but the employee "must explain that the [proposed] adjustment in working conditions . . . is for a medical condition-related reason. . . ." *Id.* Once an accommodation is requested, an employer must engage in the "interactive process," or a flexible dialogue, with the employee with the goal of finding an appropriate accommodation for the limitation. *Id.* **An employer that fails to engage in the interactive process in good faith violates the ADA**. *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216,

224 (5th Cir. 2011). Where the breakdown "is traceable to the employee," though, there is no violation. *Id.*

*Delaval*, 824 F.3d at 481 (emphasis added in bold).

LTTS only challenges the third element regarding the reasonable accommodation. At the outset, LTTS asserts Penneti's failure to accommodate claim is not actionable because LTTS granted Penneti his requested leave. As briefed, Penneti asserts LTTS failed to accommodate his disability under the ADA and TCHRA because LTTS delayed the grant of his requested leave. That is, Penneti asserts LTTS failed to engage in the "interactive process" of finding an appropriate accommodation for his limitation. In reply, LTTS avers there is no evidence that the "less than four week" delay regarding the approval of Penneti's accommodation was unreasonable, intentional, motivated by discriminatory intent, or constituted a failure to engage in the "interactive process." (ECF No. 73 at 24-25).

As a fellow district court has explained:

> Determining an appropriate accommodation for a disabled employee is an interactive process between the employer and the employee. *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735 (5th Cir. 1999). The ADA does not require that the employer move with maximum speed to complete the process of choosing and providing an accommodation. *Id.* at 737. The employer must simply engage in the process in good faith. *Schilling v. La. Dep't of Transp. & Dev.*, 662 F. App'x 243, 246 (5th Cir. 2016). If either party causes delay in the process, however, it may indicate a lack of good faith. *Id.* ("EEOC enforcement guidance states that '[u]nnecessary delays can result in a violation of the ADA.' ") (citations omitted).

*Johnson v. Walgreens Co.*, No. 3:21-CV-02648-L-BT, 2023 WL 2314991, at *4 (N.D. Tex. Feb. 6, 2023), *report and recommendation adopted*, No. 3:21-CV-2648-L, 2023 WL 2316194 (N.D. Tex. Mar. 1, 2023). The Fifth Circuit has explained:

> Indeed, undue delay is only an ADA violation to the extent it renders an accommodation (if any) unreasonable; **the statute provides no separate claim for undue delay**. As this Court has observed, the manner in which an employer engages in the interactive process and the speed at which that process occurs inform whether the employer has acted in good faith.

*Schilling v. Louisiana Dep't of Transportation & Dev.*, 662 F. App'x 243, 247 (5th Cir. 2016), *as revised* (Oct. 5, 2016) (emphasis added in bold).

Here, the record shows a desire for Penneti to "take leave under FMLA" on November 26, 2019. (ECF No. 56 at 30). On December 7, 2019, Penneti initially corresponded that his requested leave was for mental health, depression, exhaustion, and loss of appetite. (ECF No. 56 at 28). The record shows the first time Penneti requested leave with purported dates of leave occurred on December 11, 2019, (ECF No. 56 at 46); Penneti's correspondence stated "Requested leave: intermittent for 3 months, 2 days of leave every week to take 4 consecutive days of rest." (ECF No. 56 at 39). The attached FMLA form stated the date range of "December 16, 2019 to March 16, *2019*." (ECF No. 56 at 46) (emphasis added). The record shows both Penneti and LTTS engaged in the interactive process regarding Penneti's intermittent leave request. (ECF No. 56 at 6, 56, 51, 58, 90, 91, 92.). The record shows that on December 25, 2019, Penneti submitted specific dates for requested leave of December 16, 2019, to March 6, 2020, as indicated on his doctor's note. (ECF No. 56 at 51, 58). Thus, the record shows Penneti submitted his first specific request for intermittent leave from December 16, 2019, to March 6, 2020, sixteen days before LTTS granted his intermittent leave request.

Here, the record shows neither party caused a delay in the interactive process of choosing and providing an accommodation. Otherwise, the record is devoid of evidence that LTTS failed to engage in the interactive process in good faith in a manner that violated the ADA. Furthermore, the record shows Penneti received a reasonable accommodation when LTTS granted the requested intermittent leave; no record in the evidence shows Penneti requested any other accommodation, which LTTS denied. *See Esparza v. Bank of Am., N.A.*, No. 3:12-CV-0662-D, 2013 WL 5208024, at *13 (N.D. Tex. Sept. 17, 2013) ("[employee] has not pointed to any other accommodation

[employee] requested but was not given"). The record is devoid of evidence that LTTS failed to make a reasonable accommodation. For those reasons, the Court must conclude Penneti has not met his burden to raise a genuine issue of material fact on his failure to accommodate claims under the ADA and TCHRA. Thus, the Court GRANTS LTTS's motion for summary judgment on Penneti's failure to accommodate claims.[9]

## VI.   PENNETI'S FMLA DISCRIMINATION, RETALIATION, AND INTERFERENCE CLAIMS

*Inter alia,* the FMLA allows eligible employees working for covered employers to take "reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1)-(2)). "The FMLA grants 'an eligible employee' up to twelve weeks of annual unpaid leave for 'a serious health condition' that prevents him from performing the functions of his job." *Tatum v. Southern Co. Servs.*, 930 F.3d 709, 713 (5th Cir. 2019); *Campos*, 10 F.4th at 526. "An employer may not interfere with the exercise of any right provided under the Act, nor may it 'discharge . . . any individual for opposing

---

[9] The Court notes that, in his response, Penneti appears to assert an ADA or related TCHRA retaliation claim. (ECF No. 55 at 27-28). However, Penneti has pleaded no ADA retaliation claim. (ECF No. 1 at 4-5). The singular occurrence of a "retaliation" term in his pleading is under his FMLA claims section, reading "[d]efendants discriminated and retaliated against Plaintiff for exercising or attempt [sic] to exercise his rights under the FMLA. See [sic] 29 U.S.C. §§ 2612, 2615." (ECF No. 1 at 6) (referring to the FMLA). Otherwise, Penneti's pleadings for violations of the ADA or TCHRA contain no charges or assertions of fact that indicate an assertion of an ADA or related TCHRA retaliation claim. (*See* ECF No. 1 at 4-5).

Even if the Court were to consider such an ADA or TCHRA claim for retaliation based on a request for a reasonable accommodation as the corresponding protected activity, Penneti generally refers the Court to the same evidence—without specific citation to the record—of a causal nexus as he generally avers in his briefed arguments on his ADA and TCHRA claims. Assuming *arguendo* such a retaliation claim under the ADA or related TCHRA statute was plead, no direct evidence of retaliation exists in the record, and the *McDonnell Douglas* burden-shifting framework would apply. *See Giles v. Gen. Elec. Co.*, No. CIV. 3-97-CV-2774-H, 1999 WL 202573, at *5 (N.D. Tex. Apr. 6, 1999) (applying burden-shifting framework to ADA retaliation claim). No evidence in the record shows a causal nexus between Penneti's request for a reasonable accommodation as a protected activity and any adverse action. *See Giles*, 1999 WL 202573, at *5 ("To establish a prima facie case of retaliation under the ADA, Plaintiff must demonstrate 1) he participated in a protected activity; 2) he was subject to an adverse employment action; and 3) a casual connection exists between the protected activity and the adverse action.") (citing *Barrow v. New Orleans Steamship Ass'n*, 10 F.3d 292, 298 (5th Cir.1994)). Thus, the Court would similarly reject such a claim for ADA or TCHRA retaliation.

---

MEMORANDUM OPINION AND ORDER

any practice made unlawful' by the Act." *Tatum*, 930 F.3d at 713. "In the absence of direct evidence of discriminatory intent, [the Court applies] the *McDonnell Douglas* framework to determine the reason for an employee's discharge." *Tatum*, 930 F.3d at 713. (citations omitted).

Here, Penneti's briefing asserts direct evidence exists for his FMLA discrimination, retaliation, and interference claims, but Penneti refers the Court to no evidence in the record of direct evidence for these claims. Furthermore, the Court has found no corresponding direct evidence in the record. Therefore, the Court next addresses Penneti's FMLA claims under the respective *McDonnell Douglas* burden-shifting framework.

### A. FMLA Discrimination and Retaliation

The prima facie elements for FMLA discrimination and retaliation are similar. "To state a prima facie claim for discrimination or retaliation under the FMLA, the plaintiff must allege that '**(1)** he is protected under the FMLA; **(2)** he suffered an adverse employment decision; and either **(3a)** that the plaintiff was treated less favorably than an employee who had not requested leave under the FMLA; or **(3b)** the adverse decision was made because of the plaintiff's request for leave.'" *Hester v. Bell-Textron, Inc.*, 11 F.4th 301, 305 (5th Cir. 2021) (quoting *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998)) (emphasis added in bold); *see, e.g.*, *Lanier v. Univ. of Texas Sw. Med. Ctr.*, 527 F. App'x 312, 317 (5th Cir. 2013) (addressing prima facie elements of FMLA retaliation claim). Both Parties brief Penneti's FMLA discrimination and retaliation claims jointly, so the Court addresses these claims jointly, hereunder.

LTTS asserts Penneti cannot establish a causal connection between his request for FMLA leave and any adverse employment action by LTTS. In response, Penneti fails to independently brief his FMLA claims. Instead, Penneti relies upon the arguments and evidence he briefed in his "ADA analysis" and evidence of "discriminatory and retaliatory actions"—as briefed in his

responses on his ADA and TCHRA claims. (ECF No. 55 at 29). Penneti directs the Court to no specific evidence, statute, or case law in this argument. (*See* ECF No. 55 at 29).

As concluded above, the sole adverse employment decision Plaintiff sustained was his ultimate termination from LTTS. It is undisputed that Penneti was protected under the FMLA. Thus, in the FMLA discrimination and retaliation contexts, the respective questions before the Court are (i) whether Penneti was treated less favorably than an employee who had not requested leave and (ii) whether Penneti's termination occurred because of his request for leave.

First, there is no evidence in the record of LTTS treating Penneti less favorably than an employee who had not requested leave; neither LTTS nor Penneti offer any evidence of any comparable employee.[10] Second, there is no evidence in the record that Penneti's termination occurred because of his request for leave. To the contrary, the record shows (i) LTTS attempted to secure further work for Penneti but (ii) LTTS could not secure further work for Penneti before the separation—as noticed—was set to occur. (*See* ECF No. 44 at 94-95, 101-31). Thus the record is devoid of evidence for the third element(s) of Penneti's respective FMLA discrimination and

---

[10] The Court notes the Fifth Circuit appears to require "nearly identical" comparators in the FMLA discrimination context:

> As noted by the district court, Burton pointed to no summary judgment evidence that "she was treated less favorably than an employee who had not requested leave under the FMLA; or [that] the adverse decision was made because she took FMLA leave." *Hunt,* 277 F.3d at 768. Her references to the treatment of fellow employee JoAnn Cole did not show either that Cole had never used FMLA leave or that Cole's infraction was "nearly identical" to the infractions for which Burton was dismissed. *See Wallace v. Methodist Hosp. System,* 271 F.3d 212, 220–21 (5th Cir.2001) (compared employee's conduct must be "nearly identical" to plaintiff's). Burton therefore did not make a *prima facie* case of discrimination under the FMLA.

*Burton v. Buckner Child. & Fam. Servs., Inc.*, 104 F. App'x 394, 396 (5th Cir. 2004) (addressing FMLA discrimination claim).

retaliation claims. The Court GRANTS LTTS's motion for summary judgment as to Penneti's FMLA discrimination and retaliation claims.

## B. FMLA Interference

"A prima facie case of FMLA interference requires an employee to show that: 1) he was an eligible employee; 2) his employer was subject to FMLA requirements; 3) he was entitled to leave; 4) he gave proper notice of his intention to take FMLA leave; and 5) his employer denied the benefits to which he was entitled under the FMLA." *Campos*, 10 F.4th at 526 (citation omitted). The Fifth Circuit "does not apply categorical rules for the content of the notice" and instead focuses on what is "'practicable' based on the facts and circumstances of each individual." *Lanier*, 527 F. App'x at 316 (citing *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 762-64 (5th Cir. 1995)); *see also* 29 C.F.R. § 825.303(b). "The employer is not required to be clairvoyant," but "may have a duty to inquire further if statements made by the employee warrant it." *Lanier,* 527 F. App'x at 316 (citing *Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 980 (5th Cir. 1998)). "Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act." 29 C.F.R. § 825.303(b). The Fifth Circuit has explained:

> Even when an employee's need for leave is unforeseeable, the regulations make clear the employee's duty to comply with the employer's policy. "When the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.303(c).

*Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 789 (5th Cir. 2017).

For a FMLA interference claim, the employee also must show that the violation prejudiced him. *Campos*, 10 F.4th at 526 (citation omitted). The Fifth Circuit requires courts to "conduct[] a case-by-case examination of whether a plaintiff has been prejudiced by noncompliance with a

regulation." *Downey v. Strain*, 510 F.3d 534, 541 (5th Cir. 2007). In discussing prejudice in the FMLA interference context, another court has explained:

> "Prejudice exists when an employee losses compensation or benefits by reason of the violation, sustains other monetary losses as a direct result of the violation, such as the cost of providing care, or suffers some loss in employment status such that equitable relief is appropriate."

*Matson v. Sanderson Farms, Inc.*, 388 F. Supp. 3d 853, 873 (S.D. Tex. 2019) (block quoting *Jones v. Children's Hosp.*, 58 F. Supp. 3d 656, 669 (E.D. La. 2014)); *see, e.g.*, *Garcia v. Randolph-Brooks Fed. Credit Union*, No. SA-18-CV-00978-OLG, 2019 WL 1643741, at *3 (W.D. Tex. Apr. 16, 2019), *report and recommendation adopted*, No. CV SA-18-CA-978-OLG, 2019 WL 2565270 (W.D. Tex. May 9, 2019) (discussing the same).

Here, LTTS asserts there is no evidence (i) that it denied benefits to which Penneti was entitled under the FMLA and (ii) that any such violation prejudiced Penneti. In response, Penneti argues he was denied benefits because (i) LTTS discouraged Penneti from taking leave as requested; (ii) he received a shorter intermittent leave period than requested and (iii) LTTS removed Penneti from the Sonim project. Penneti offers no response regarding the sixth element of prejudice.

The Court pretermits discussion of whether LTTS denied benefits to which Penneti was entitled under the FMLA because there is no evidence in the record that Penneti was prejudiced. The record shows, and it is uncontroverted, that for Penneti's requested reasonable accommodation, LTTS required a doctor's note for Penneti's requested leave as "process and policy." (ECF No. 44 at 77; ECF No. 56 at 6)[11] The record shows Penneti complied with this

---

[11] Penneti avers that "Tewari testified that she is not aware of any written policy requiring any documentation in additional [sic] to the medical certification." (ECF No. 55 at 13-14). Penneti refers the Court to "App. 46,"—which is (ECF No. 56 at 49)—but that page of summary judgment evidence does not contain such evidence. Indeed, the Court has found no evidence in the record that Tewari was unaware of

policy on December 25, 2019, and Penneti received his accommodation sixteen days later. (ECF No. 56 at 48-49, 51, 58). Even if the Court were to assume *arguendo* of Penneti's briefing that (i) he was "discouraged" from taking leave and (ii) his leave was "cut short" were allegations of prejudice, there is no evidence in the record that denial of his requested intermittent leave from December 16, 2019 to January 10, 2020 prejudiced Penneti in any substantive way. *See Campos*, 10 F.4th at 527. That is, even if the Court assumes the delay of the requested leave from December 19, 2019, to January 10 2020, constituted a violation of the FMLA, there is no evidence that Penneti lost compensation, benefits, other monetary losses, or loss in employment status as a result of this violation. *See Matson*, 388 F. Supp. 3d at 873. To the contrary, the record shows he maintained the same compensation and benefits until his ultimate termination on May 13, 2020.

For those reasons and in light of the record, the Court must conclude Penneti has not proved the prejudice necessary to prevail on a FMLA interference claim. *See Campos*, 10 F.4th at 527.

---

written policy requiring additional documentation. Instead, the record shows that the LTTS policies regarding reasonable accommodations state:

> Employees must also cooperate in good faith in the Company's efforts to evaluate the accommodation. *This* may involve meetings or discussions with you, the Human Resources Department, Management and/or your supervisors or others to discuss the accommodation or *may involve gathering additional information from your health care provider or others regarding the accommodation*.

ECF No. 44 at 60) (emphasis added). Furthermore, Penneti avers he "immediately" requested details for what was required on the doctor's note on December 23, 2020, but the record of Tewari's instructions to Penneti regarding the doctor's note from December 16, 2020 already stated:

> Hi Rajesh,
>
> In order for HR to review your case *please send me a doctors note clearly indicating the restrictions and the start date and end date of the restrictions*. . . . As soon as I receive your note we will get back to you [sic]

(ECF No. 56 at 54) (emphasis added).

---

Thus, the Court GRANTS LTTS's motion for summary judgment as to Penneti's FMLA interference claim.

## VII.   PRETEXT

As determined above, Penneti has failed to direct the Court to evidence on at least one essential element for each of his claims asserted under the ADA, TCHRA, and FMLA. Thus, Penneti has failed to make out a prima facie case for discrimination and retaliation as required and the burden does not shift to LTTS. *See, e.g.*, *Haynes v. Pennzoil Co.*, 207 F.3d 296, 301 (5th Cir. 2000) (ending its analysis and affirming district court's grant of summary judgment after concluding plaintiff "failed to establish a prima facie case of racial discrimination under Title VII"); *Owens* 33 F.4th at 835 (applying the *McDonnell Douglas* framework to a retaliation claim under Title VII and 42 U.S.C. § 1981). Nevertheless—assuming *arguendo* that Penneti had met his burden to show a prima facie case—LTTS produced evidence of a legitimate, non-discriminatory, and non-retaliatory reason for terminating Penneti's employment. *Owens*, 33 F.4th at 835 (discussing pretext in the discrimination context); *Feist*, 730 F.3d at 454 (discussing pretext in the retaliation context). Here, LTTS produced evidence of one overarching reason for the termination—LTTS was not able to secure further work for Penneti.

Next, under the third step of the *McDonnel Douglas* framework, Penneti must counter this evidence of LTTS's inability to secure further work with "substantial evidence" for the termination as pretextual. *See Owens*, 33 F.4th at 825; *see also Vaughn*, 665 F.3d at 637. For pretext in the discrimination context, the Fifth Circuit has explained:

> The plaintiff must rebut each nondiscriminatory reason articulated by the employer. *Wallace,* 271 F.3d at 220. A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or "unworthy of credence." *Id.; Reeves,* 530 U.S. at 143, 120 S.Ct. at 2106. An explanation is false or unworthy of credence if it is not the real reason for the

---

MEMORANDUM OPINION AND ORDER                                    Page **25** of **28**

adverse employment action. *See Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 899 (5th Cir. 2002).

*Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (addressing discrimination claims under Title VII and the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978). "Disparate treatment occurs where an employer treats one employee more harshly than other 'similarly situated' employees for 'nearly identical' conduct." *Vaughn*, 665 F.3d at 637. For pretext in the retaliation context, the Fifth Circuit has explained: "[a]n employee establishes pretext by showing that the adverse action would not have occurred "but for" the employer's retaliatory reason for the action." *Hague v. Univ. of Texas Health Sci. Ctr. at San Antonio*, 560 F. App'x 328, 336 (5th Cir. 2014) (citing *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 477, 479–80 (Tex. 2001)). Nonetheless,"[t]he standard of causation for reviewing pretext is less stringent under Texas state law than under federal law. *Campos*, 10 F.4th at 521. In addressing a disability discrimination claim under the TCHRA, the Fifth Circuit explained:

> Though a "but for" standard would apply under federal statutes, the Texas framework applies a "motivating factor" standard in all state unlawful-employment-practice claims under Section 21.125 of the Texas Labor Code. *Id.* at 480. Because Section 21.125 includes disability discrimination, the motivating-factor test is applicable here. *See* Tex. Lab. Code § 21.125(a).

*Campos*, 10 F.4th at 521. As discussed above, Penneti's sole adverse employment decision was his termination.

Regarding pretext in the discrimination context, Penneti first avers that he was removed from the Sonim and OMADM projects "because of his disability," but Penneti refers the Court to no corresponding evidence. And, upon review of the summary judgment evidence, the record is devoid of direct evidence or circumstantial evidence, thereof. Penneti argues LTTS did not place him on the "bench" for other work opportunities, but there is neither evidence nor argument as to

---

MEMORANDUM OPINION AND ORDER                                   Page **26** of **28**

how this failure constituted pretext for his termination.[12] In passing, Penneti appears to assert a comparator as "the individual who replaced Penneti on the Sonim project and had his Sonim project extended until June 2020 and was immediately placed on another project," but Penneti refers the Court to no evidence of (i) this "individual," (ii) how or why Penneti and the "individual" were comparators, or (iii) any corresponding evidence that LTTS treated Penneti more harshly than this "individual" who was similarly situated for nearly identical conduct. *See Vaughn*, 665 F.3d at 637.[13] Penneti asserts LTTS's reason for termination was false or unworthy of credence because (i) this other "individual" employee was placed on another project and (ii) "that the mobile testing division of LTTS was not as impacted by COVID-19 as other industries." However, again, Penneti fails to direct the Court to corresponding evidence in the record. Even assuming such definitive evidence in the record existed, such evidence fails to show LTTS's inability to secure further work for Penneti was false or unworthy of credence.

Penneti does not independently brief pretext in the retaliation context—instead generally relying on the same pretext bases the Court rejected, above.[14] In review of the summary judgment

---

[12] As undisputed, LTTS attempted to secure further work for Penneti but was not able to do so. Assuming *arguendo* LTTS's failure to place Penneti on the "bench" constituted a deviation from LTTS standard procedure, "mere deviations from standard procedure do not show pretext or improper discrimination unless the plaintiff can connect the departure from procedure to a discriminatory motive." *Tagliabue v. Orkin, L.L.C.*, 794 F. App'x 389, 398 (5th Cir. 2019). Here, Penneti offers neither argument nor evidence that the departure from placing him on the "bench" was tied to any discriminatory motive.

[13] Elsewhere in their briefing, the Parties discuss another employee named Srikanth Girigri, but no evidence in the record indicates Girigiri was a comparator. That is, there is no evidence Penneti and Girigiri were similarly situated. *Saketkoo v. Administrators of Tulane Educ. Fund*, 31 F.4th 990, 998 (5th Cir. 2022) (addressing gender discrimination claim under Title VII); *see generally Lee v. Conecuh Cnty. Bd. of Ed.*, 634 F.2d 959, 962 (5th Cir. 1981) (discussing comparators in the sex-based equal protection context). Furthermore, there is no evidence of any other employee requesting intermittent FMLA leave.

[14] Penneti does not brief pretext in the FMLA interference context. *See Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017) (collecting cases); *see, e.g., Miller v. Metrocare Servs.*, 809 F.3d 827, 832 (5th Cir. 2016) (where a plaintiff brought both interference and retaliation claims under the FMLA, requiring the plaintiff to offer sufficient evidence that an employer's articulated reason for firing him was "a pretext for discrimination" in support of those claims).

---

evidence for pretext under both the "but for" and "mixed-motive" causation standards, the record is devoid of evidence of (i) disparate treatment or (ii) that LTTS's inability to secure Penneti further work was false or unworthy of credence. *See Laxton*, 333 F.3d at 578. The Court must conclude that Penneti fails to present substantial evidence that LTTS's reason for terminating his employment—LTTS's inability to secure further work for Penneti—was false, unworthy of credence, or not true in either the discrimination or retaliation contexts. *Owens*, 33 F.4th at 825. Thus, the Court must conclude the record contains no evidence of pretext for Penneti's corresponding ADA, TCHRA, and FMLA claims.

### VIII.   CONCLUSION

For the reasons enumerated above, the Court GRANTS LTTS's motion for summary judgment on all of Penneti's claims against LTTS.

**SO ORDERED.**

20th day of July, 2023.

ADA BROWN
UNITED STATES DISTRICT JUDGE