**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RAJESH PENNETI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-00525-E |
| | § | |
| L&T TECHNOLOGY SERVICES LTD and | § | |
| SONIM TECHNOLOGIES, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Sonim Technologies Inc. (Sonim)'s motion for summary judgment (Sonim's Motion), which seeks to dismiss all of Plaintiff Rajesh Penneti's claims against it. Penneti has responded, and Sonim has replied. For the reasons enumerated below, the Court GRANTS Sonim's Motion.

### I.    BACKGROUND

#### A.  Penneti's Work at Sonim, FMLA Request to LTTS, and Work Separation from Sonim Project

Penneti began working for Defendant L&T Technology Services Ltd (LTTS) in January 2014. (ECF No. 79 at 5). LTTS provides IT staffing services to customers in the medical, IT, and telecom industries. (ECF No. 79 at 5). In 2017, Penneti began treatment with a psychotherapist for depression. (ECF No. 79 at 5). In 2019, a psychiatrist diagnosed Penneti with major depressive disorder and general anxiety disorder. (ECF No. 79 at 5).

In September 2019, LTTS assigned Penneti to work a project at Sonim after LTTS submitted its recommendation of Penneti to Sonim. (ECF No. 71 at 34; ECF No. 79 at 5).[1] On the Sonim project, Penneti worked as a mobile handset protocol field test engineer. (ECF No. 71 at 45). In November 2019, Penneti's physician recommended he take leave from work; on November 26, 2019, Penneti emailed LTTS's human resources that he would like to take leave under the Family Medical Leave Act (FMLA). (ECF No. 79 at 6). On December 11, 2019, Penneti submitted a completed FMLA form to LTTS. (ECF No. 79 at 40-48). On January 10, 2020, LTTS approved Penneti's FMLA leave from January 13, 2020 to March 16, 2020. (ECF No. 79 at 8, 49-59).

On January 13, 2020, Bonde—who was Penneti's supervisor at LTTS—emailed Penneti's project Test Manager at Sonim, Rajesekar Dhanasekaran, the following:

> Rajesh P who is working on SONIM assignment in Dallas is facing some medical issues, Doctor has suggested him to take some rest hence he has applied FMLA. Doctor has suggested him to take 2 days of leave every week for sometime. He will be taking Monday and Tuesday leave every week from today. Hope this if fine with you [sic]

(ECF No. 79 at 73). That same day, Dhanasekaran responded:

> We didn't get any information prior to this email and We are NOT okay with below proposal. We would request the engineer to continue his support till we find a replacement with KT.
> Also we are unhappy with things happening at FT which is affecting our "QA deliverables".

(ECF No. 79 at 73). Bonde proposed a plan to Sonim regarding Penneti's leave involving other workers "to minimize the impact on project deliverable." (ECF No. 44 at 97). On January 14, 2020,

---

[1] Penneti further testified:

> So I work in LTTS and LTTS gets contracts from other companies like Intel, Sonim, and they asked for associates and LTTS provides the associates for compensation from its clients.

(ECF No. 71 at 34).

Dhanasekaran at Sonim removed Penneti from the Sonim project, effective January 17, 2020. (ECF No. 79 at 72). From March 12, 2020, to May 5, 2020, Penneti worked on a training project at LTTS. (ECF No. 79 at 9). On April 27, 2020, Sonim placed a hold on all further requirements from LTTS because Sonim ended its contract with LTTS. (ECF No. 71 at 50). On May 13, 2020, LTTS terminated Penneti's employment at LTTS. (ECF No. 79 at 9).

### B. Procedural History

On March 8, 2021, Penneti filed his complaint, which asserts claims against Sonim for (i) disability discrimination under the Americans with Disabilities Act (ADA); (ii) disability discrimination under the Texas Commission on Human Rights Act (TCHRA); (iii) failure to accommodate disability under the ADA; (iv) failure to accommodate disability under the TCHRA; (v) interference with exercise of rights under the FMLA; and (vi) discrimination and retaliation under the FMLA. Sonim has moved for summary judgment on each of these claims. Having been fully briefed, the Court GRANTS Sonim's Motion for the reasons enumerated hereunder.

## II. SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate when the pleadings and evidence on file show "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. A court must view all evidence and draw all reasonable inferences in the light most favorable to a party opposing a summary judgment motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). A court "may not make credibility determinations or weigh the evidence" in ruling on the motion. *Reeves*, 530 U.S. at 150; *Anderson*, 477 U.S. at 254-55. Moreover, the evidence the non-movant provides

must raise "more than ... some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The evidence must be such that a jury could reasonably find in the non-movant's favor. *Anderson*, 477 U.S. at 248. If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

The moving party bears the initial burden of showing the court there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party with the burden of proof on an issue "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted). When, as here, a nonmovant bears the burden of proof, the movant may demonstrate it is entitled to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25 (emphasis added). There is "no genuine issue as to any material fact [if] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Once the movant has made this showing, the burden shifts to the nonmovant to establish there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Celotex*, 477 U.S. at 324. "[C]onclusory allegations, speculation, and unsubstantiated assertions" will not satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1). A court "resolve[s] factual controversies in favor of a nonmoving party . . . only when an actual

---

controversy exists, that is, when both parties have submitted evidence of contradictory facts."

*Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

"A party opposing such a summary judgment motion may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co*., 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). The Fifth Circuit has explained:

> The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. . . . "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992).

*Ragas*, 136 F.3d at 458. Regarding assertions of fact, Federal Rule of Civil Procedure 56 states:

> [i]f a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion [and] (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]

Fed. R. Civ. P. 56(e)(2)-(3).

### III.    ANALYTICAL FRAMEWORKS

Because several of Penneti's claims allege discrimination or retaliation, the Court provides the following *McDonnell Douglas* burden-shifting framework analyses, which are common to employment discrimination and retaliation claims. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) ("To succeed on a claim of intentional discrimination under Title VII, Section 1983, or Section 1981, a plaintiff must first prove a prima facie case of discrimination.") (collecting cases); *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (addressing ADA discrimination claim under burden-

shifting framework); *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 520 (5th Cir. 2021) ("Because the Texas statute parallels the ADA, we treat such claims similarly.");[2] *Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006) (addressing FMLA retaliation under burden-shifting framework)

### A. Employment Discrimination

"A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *see, e.g.*, *Gaalla v. Brown*, 460 F. App'x 469, 479 (5th Cir. 2012) (addressing racial discrimination). Regarding direct evidence, the Fifth Circuit has explained:

> Direct evidence [of discriminatory intent] is evidence which, if believed, proves the fact without inference or presumption. . . . It includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action.

*Gaalla*, 460 F. App'x at 479 (internal quotations omitted). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell*, 235 F.3d at 222. Circumstantial evidence includes statements that merely suggest discriminatory motive or require the fact finder to draw an inference as to whether the comment is probative of an employer's discriminatory animus. *Sandstad v. CB*

---

[2] The Texas Supreme Court has explained that claims asserted under the TCHRA should be analyzed in the same manner as its federal analogues. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633–34 (Tex. 2012) (citations omitted) ("Because one of the purposed of the TCHRA is to 'provide for the execution of the policies of Title VII of the Civil Rights Act of 1964,' we have consistently held that those analogous federal statutes and the cases interpreting them guide our reading of the TCHRA."); *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003) (noting the *McDonnell Douglas* burden shifting analysis applies to TCHRA disability discrimination cases); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004) (discussing disability discrimination under the TCHRA as parallel to the ADA).

*Richard Ellis, Inc.*, 309 F.3d 893, 897-98 (5th Cir. 2002), *cert. denied,* 539 U.S. 926 (2003). The

Fifth Circuit has explained the three-step *McDonnell Douglas* framework as follows:

> Under that framework, [a plaintiff] must make out a prima facie case of discrimination. *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021). If she succeeds, [a defending employer] must respond with a "legitimate, nondiscriminatory reason" for terminating [the plaintiff]. *Id.* at 282. Then the burden shifts back to [the plaintiff], who must counter with substantial evidence that [the defending employer's] proffered reason is pretextual. *Id.*

*Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022). The second step of the

*McDonnell Douglas* framework requires an employer's *production* of a legitimate,

nondiscriminatory reason for terminating a plaintiff, but this second step "can involve no

credibility assessment." *Reeves*, 530 U.S. 133, 142 (citing *St. Mary's Honor Center v. Hicks*, 509

U.S. 502, 509 (1993)).[3] Regarding the third step of the *McDonnell Douglas* framework, "the

plaintiff can rely on evidence that the employer's reasons were a pretext for unlawful

discrimination." *Russell*, 235 F.3d at 222 (citing *McDonnell Douglas*, 411 U.S. at 804).

### B. Employment Retaliation

"A plaintiff may prove a retaliation claim through direct or circumstantial evidence." *Jones*

*v. Overnite Transp. Co.*, 212 F. App'x 268, 275 (5th Cir. 2006). "Without direct evidence, the

plaintiff must establish his cause of action using circumstantial evidence and the *McDonnell*

*Douglas* burden-shifting framework," discussed above. *Jones*, 212 F. App'x at 275. "If the plaintiff

establishes a prima facie case, then the defendant must show a non-retaliatory, legitimate reason

for the adverse action." Again, this second step of the *McDonnell Douglas* framework requires an

employer to produce evidence of a non-retaliatory, legitimate reason for the adverse action—but

---

[3] Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

requires no burden of persuasion. *See Jones*, 212 F. App'x at 275; *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002) ("We agree that [t]he ultimate burden of persuading the trier of fact that the defendant [retaliated] against the plaintiff remains at all times with the plaintiff.") (internal quotation omitted). "Once the defendant meets this burden, the plaintiff must in turn offer evidence to create a genuine issue of material fact that the defendant's reason is not true, but is instead a pretext for discrimination." *Jones*, 212 F. App'x at 275; *see, e.g.*, *Gee*, 289 F.3d at 345 (discussing the same).

## IV.   WHETHER PENNETI WAS AN EMPLOYEE OF SONIM UNDER ADA, TCHRA, AND FMLA

It is undisputed that LTTS was Penneti's employer. However, Penneti's claims as to Sonim raise a question as to whether Plaintiff was also an employee of Sonim—with Sonim serving as a joint employer alongside LTTS. Thus, the question before the Court is whether Sonim's relationship with Penneti constituted an employment relationship. Under these circumstances, if Sonim was not an "employer" of Penneti, then Penneti's claims under the ADA, TCHRA, and FMLA are not cognizable against Sonim.

### A.   Whether Penneti was an Employee of Sonim Under the ADA and TCHRA

Penneti has pleaded claims of discrimination and failure to accommodate under the ADA and TCHRA against Sonim. Regarding claims of discrimination, "[t]he ADA prohibits an employer from discriminating against a 'qualified individual with a disability on the basis of that disability.'" *LHC Grp., Inc.*, 773 F.3d at 694 (citing 42 U.S.C. § 12112(a)). Furthermore, "Texas law prohibits employers from discriminating against their employees based on disability." *Campos*, 10 F.4th at 520 (citing Tex. Lab. Code § 21.051(1)). As pleaded, the ADA discrimination analysis applies equally to Penneti's TCHRA discrimination claim, so the Court analyzes each of these claims together. *See Campos*, 10 F.4th at 520; *see, e.g.*, *Clark v. Champion Nat'l Sec., Inc.*,

952 F.3d 570, 578 n.16 (5th Cir. 2020) (collecting cases). Regarding reasonable accommodations, the ADA "requires an employer to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability[.]'" *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016) (quoting 42 U.S.C. § 12112(b)(5)(A)).

The ADA applies specifically to "covered entities." 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.").[4] The ADA defines "covered entity" as "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). The ADA defines "employer" as follows:

> The term "employer" means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years following the effective date of this subchapter, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.

42 U.S.C. § 12111(5)(A). The ADA defines "employee" as "an individual employed by an employer." 42 U.S.C. § 12111(4).

In determining whether Sonim was Penneti's employer under the ADA "it is appropriate to apply the 'hybrid economic realities/common law control test.'" *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 227 (5th Cir. 2015) (internal citations omitted). The Fifth Circuit has explained:

---

[4] *See also Bloom v. Bexar Cnty., Tex.*, 130 F.3d 722, 724 (5th Cir. 1997) ("ADA Title I makes it unlawful for a covered entity to discriminate against a qualified individual with a disability[]").

"The right to control an employee's conduct is the most important component of this test," and we consider "whether the alleged employer has the right to hire and fire the employee, the right to supervise the employee, and the right to set the employee's work schedule." *Id.* at 119. "The economic realities component of our test has focused on whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment." *Id.*

*Burton*, 798 F.3d at 227 (citing *Deal v. State Farm Cnty. Mut. Ins. Co. of Texas*, 5 F.3d 117, 119 (5th Cir.1993)) The Court next addresses each respective component.

       *i.*     *Common Law Control*

In regard to the common law control component, Sonim first argues that it did not have the right to hire and fire Plaintiff and did not exercise any such right. (ECF No. 70 at 11). In response, Penneti avers Sonim was the "ultimate decisionmaker" on whether Penneti would be hired on the Sonim project and that Sonim had the right to end Penneti's assignment. (ECF No. 78 at 10). The record shows Sonim selected Penneti as one of the five test engineers to work on the Sonim project, but only after LTTS "identified, provided, and placed its employees to work" on the Sonim Project. (ECF No. 71 at 49). It is undisputed that, after Sonim ended Penneti's assignment, Penneti continued to work at LTTS on other projects—receiving the same compensation and benefits as he had when working at the Sonim Project.[5] Thus, the record shows after Penneti's assignment at Sonim ended, Penneti continued to work with LTTS—he was not fired at that time. There is no evidence in the record that Sonim caused or contributed to Penneti's ultimate termination from LTTS. Indeed, Penneti appears to concede in his declaration that LTTS fired him because LTTS did not place him on another project.[6] As the record is devoid of corresponding evidence that

---

[5] Indeed, as the Court has determined in adjudicating Penneti's discrimination claims against LTTS, the only adverse employment action Penneti sustained was his ultimate termination from LTTS.

[6] Penneti declares:

Sonim hired or fired Penneti, the Court concludes there is no evidence of this factor of the common law control component.

Next, Sonim argues it did not have the right to supervise Penneti and did not supervise Penneti. Penneti responds that "Sonim's test managers managed the day-to-day operations, as admitted by Sonim's corporate representative and evidenced by Sonim's email regarding the need for a one-on-one discussion with Penneti about his performance." (ECF No. 78 at 16). But, Penneti refers the Court to no corresponding evidence. Upon review of the evidence, the record shows Sonim's corporate representative (i) was "not intimately familiar" with the Sonim test managers' "day-to-day job duties" and (ii) was "not really sure exactly how the test execution was being done for the field testing." (ECF No. 79 at 136-37). Although Sonim's corporate representative described broad duties of the test managers, there is no testimony specific to Penneti or Sonim's day-to-day control over Penneti. (ECF No. 79 at 136-37). To the contrary, Sonim's corporate representative testified "[LTTS] is responsible for the management of the resource. Our managers are only responsible for monitoring the deliverables. . . . [resources] are employees of LTTS and not employees of Sonim, and Sonim does not manage their activities."[7] Additionally, although the record shows evidence of a November 2019 email of a "1-1 discussion" between Sonim Test Manager Dhanasekaran and Penneti, the record contains no evidence as to whether the discussion

---

> On April 29, 2020, I received an email from Srishti Tewari stating that my internal assignment was ending on May 5, 2020, and my last date of employment with LTTS would be May 13, 2020. The email stated LTTS would be looking for other assignments for me during this two-week period, but I would be terminated effective May 13, 2020, if no other assignments were available. . . . I was not placed on another internal or external project, and I was terminated from LTTS on May 13, 2020."

(ECF No. 79 at 9).

[7] The Sonim Corporate representative further "assumes" the test managers tell resources "what needs to be done on a particular day." (ECF No. 79 at 138).

included any guidance or direction. (ECF No. 79 at 142).[8] Although the record contains correspondence between Sonim employees—and not Penneti—regarding Penneti's work performance, (ECF No. 79 at 143-44), the record shows (i) Dhanasekaran at Sonim requesting LTTS employees supervise Penneti, (ECF No. 71 at 22) and (ii) LTTS employees discussing and supervising Penneti, correspondingly, (ECF No. 71 at 20-21).[9]

Penneti next refers the Court to evidence of "Sonim test managers" telling "LTTS 'resources' what needed to be done on a particular day"—referring the Court to a lengthy quote regarding Sonim's treatment of "leads," but (i) Penneti's citation to the record only refers the Court to Sonim's Corporate representative's assumption(s) and (ii) there is no corresponding discussion of "leads" in the record as cited. (ECF No. 78 at 10; ECF No. 79 at 137). Indeed, the Court has found no such corresponding evidence in the record.

Penneti avers Sonim provided him with some equipment to perform field testing and maintained personal records on him; however (i) no evidence in the record of Sonim's provision of equipment suggests or explains any nexus of control over Penneti and (ii) the evidence Penneti refers the Court regarding these "personal records" of Penneti's date of birth, blood type, emergency contact information, and Skype ID is not competent summary judgment evidence. (*See* ECF No. 79 at 141); *see Douglass*, 79 F.3d at 1429.[10] The record is otherwise devoid of evidence

---

[8] Indeed, the email from Dhanasekaran to Penneti merely states "1-1 discussion on few topics. 1. Working Hours 2. Productivity and Pro-activeness 3. Synch-up, Discussion & closing the open items." (ECF No. 79 at 142).

[9] Penneti refers the Court to email correspondence between Sonim employees that occurred on June 4, 2020—after Penneti's assignment with Sonim ended; after Sonim placed a hold on all further requirements from LTTS; and after Penneti's termination from LTTS. (ECF No. 79 at 139).

[10] The only purported evidence of such records from Sonim of Penneti's personal records is a single page that depicts a photo and lists various categories of information. The page is not attached to any other record of any kind, is not marked as attributable to Sonim or any employer in any way, and there is no evidence in the record that verifies or authenticates the document as Sonim's record. Indeed, although Penneti

---

that Sonim maintained such employment records on Penneti. Thus, in the context of Penneti's assignment on the Sonim project, this evidence does not indicate control. Indeed, it is undisputed Sonim provided no training to Penneti and "relied on [Penneti]'s experience and expertise to conduct the testing." (ECF No. 71 at 49). Sonim's corporate representative further testified and it is uncontroverted that:

> Sonim relied on Plaintiff's expertise to determine the appropriate steps to execute the testing. Thus, it was Plaintiff's job to execute test cases to verify the quality and stability of the mobile devices and the compliance of their architecture to the 3GPP standards of wireless industry.
> . . . .
> Although Sonim imposed a requirement that all Test Engineers on the Sonim field testing project must work full-time for five days per week due to the need to coordinate testing with Sonim's employees in India, it did not set any other term or condition regarding Plaintiff's work schedule and Plaintiff was allowed to work from home.

(ECF No. 71 at 50). As the record is devoid of corresponding evidence that Sonim supervised Penneti or set his work schedule, the Court concludes there is no evidence of these factors of the common law control component. The Court concludes that none of the factors under the common law control component favor a conclusion that Penneti was an employee of Sonim.

   ii.   *Economic Realities*

   Here, Sonim argues that none of the factors in the economic realities component of the hybrid economic realities/common law control test—"whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment"—favor a finding or conclusion of an employment relationship between Sonim and

---

purports the document as Sonim's recording-keeping, Penneti refers the Court to no evidence to substantiate the document as such, and the Court has found no such corresponding evidence.

Penneti. *See Burton*, 798 F.3d at 227. Penneti offers no response, instead averring that "the common law control test is dispositive." (ECF No. 78 at 16).[11]

Here, the evidence is undisputed that LTTS paid Penneti's salary, provided benefits, granted Penneti's FMLA leave request, and set the terms and conditions of his employment. There is no evidence to the contrary. The Court must conclude the record is devoid of competent evidence that the economic realities component supports a finding or conclusion that Sonim had an employment relationship with Penneti as employer. Thus, the record is devoid of evidence of an employment relationship between Sonim and Penneti that would give rise to Sonim's obligations under the ADA and TCHRA as an employer—as a "covered entity." *See* 42 U.S.C. § 12112(a); 42 U.S.C. § 12111(5)(A); *Burton* , 798 F.3d at 227. The Court must consequently GRANT Sonim's motion for summary judgment as to Penneti's claims asserted under the ADA and TCHRA.[12]

**B. Whether Penneti was an Employee of Sonim Under the FMLA**

Penneti has pleaded claims of discrimination, retaliation, and interference under the FMLA against Sonim. The FMLA defines "employer" as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. § 2611(4)(A)(i). The Fifth Circuit has explained that "decisions interpreting the [Fair Labor Standards Act (FLSA)] offer the best guidance for construing the term 'employer' as it is used in the FMLA." *Modica v. Taylor*, 465 F.3d 174, 186 (5th Cir. 2006) (quoting *Wascura v. Carver*, 169

---

[11] The Court disagrees that the common law control test is independently "dispositive," but the Court recognizes that "[t]he [common law control and economic realities] tests are in equipoise" and the Fifth Circuit has determined an "emphasis on the common law control test is dispositive." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 228 (5th Cir. 2015).

[12] Even if the Court were to entertain Penneti's ADA and TCHRA claims against Sonim, independently, those claims would be rejected for essentially the same reasons the Court has granted summary judgment in favor of LTTS on LTTS's motion for summary judgment.

---

MEMORANDUM OPINION AND ORDER

F.3d 683, 686 (11th Cir. 1999)); *see, e.g.*, *Harville v. Texas A & M Univ.*, 833 F. Supp. 2d 645, 654 (S.D. Tex. 2011) (discussing the same).

To construe whether an entity is an "employer," the Fifth Circuit has enumerated a four-factor "economic reality" test that includes inquiries into:

> whether the alleged employer (1) has the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.

*Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990) (block quoting *Carter v. Dutchess Community College,* 735 F.2d 8, 12 (2d Cir. 1984)) (internal parenthetical omitted); *see, e.g.*, *Williams v. Henagan*, 595 F.3d 610, 620 (5th Cir. 2010) (discussing the same four-factor test). Additionally, "[w]here two businesses 'exercise some control over the work or working conditions of the employee, the businesses may be joint employers under FMLA.'" *Cuellar v. Keppel Amfels, L.L.C.*, 731 F.3d 342, 345 (5th Cir. 2013) (quoting 29 C.F.R. § 825.106(a). The Fifth Circuit further explained:

> Under the relevant regulations, a joint employer's obligations under the FMLA depend on whether it is the "primary" or "secondary" employer. *Id.* § 825.106(c). Where an employee obtains employment through a temporary placement agency, "the placement agency most commonly would be the primary employer." *Id.*
> . . . .
> Only the primary employer is responsible for providing FMLA leave. *Id.* § 825.106(c). In addition, "[j]ob restoration is the primary responsibility of the primary employer." *Id.* § 825.106(e). **A secondary employer bears only a conditional burden: it "is responsible for accepting an employee returning from FMLA leave ...** *if* **[it] continues to utilize an employee from the temporary placement agency, and the agency chooses to place the employee with the secondary employer."** *Id.* (emphasis added).
>
> **A secondary employer is not without independent FMLA obligations, however. In addition to its conditional job-restoration duty, a secondary employer is "***also* **responsible for compliance with the prohibited acts provisions with respect to its jointly employed employees...."** *Id.* (citing § 825.220(a)) (emphasis added). The "prohibited acts provisions" appear in § 2615[].

*Cuellar*, 731 F.3d at 345–46 (citing 29 U.S.C. § 2615(a)) (emphasis added in bold). "A determination of whether or not a joint employment relationship exists is not determined by the application of any single criterion, but rather the entire relationship is to be viewed in its totality." 29 C.F.R. § 825.106(b)(1).

    i.    *Economic Reality Test*

Here, Sonim first avers that the four-factor economic reality test does not favor a finding or conclusion that Sonim was an "employer" of Penneti under the FMLA. Penneti does not provide an independent response to the economic reality test under the FMLA; instead, Penneti avers generally to the same bases he raised to substantiate an employment relationship in the ADA and TCHRA context, which the Court rejected above. No evidence in the record shows Sonim had the power to hire and fire Penneti. No evidence in the record shows Sonim supervised Penneti, controlled his work schedule, or controlled the conditions of his employment. No evidence in the record shows Sonim determined the rate or method of Penneti's payments. And, as discussed above, the record is devoid of competent evidence that Sonim maintained employment records on Penneti. To the contrary, Sonim's corporate representative testified that "Sonim did not maintain any employment or payroll records of [Penneti]." (ECF No. 71 at 50). Thus, the Court must conclude there is no evidence that Sonim was an employer of Penneti under the economic reality test.

    ii.    *Joint Employer Analysis*

For the purposes of Penneti's FMLA claims, the Court assumes LTTS and Sonim were joint employers. As briefed regarding joint employer status, the Parties treat (i) LTTS as a primary employer and (ii) Sonim as a secondary employer. Previously, the Court determined that no evidence exists on at least one element of Penneti's claims against LTTS, which are identical to

the claims Penneti asserts against Sonim. Thus, for Sonim to be liable under the FMLA as a joint employer (secondary employer), there must be evidence of (i) Sonim's conditional burden and (ii) Sonim's compliance with the prohibited acts provisions regarding Penneti. *See Cuellar*, 731 F.3d at 345–46.

First, there is no evidence in the record of Sonim's conditional burden to re-hire or otherwise employ Penneti after his return from FMLA leave. The record shows—and it is undisputed—that Penneti's FMLA leave ended on March 16, 2020, and from March 12, 2020 to May 5, 2020, LTTS had placed Penneti on a training project at LTTS. (ECF No. 79 at 8-9). There is no evidence in the record that LTTS choose to place Penneti with Sonim; thus, the condition precedent to Sonim's burden as a secondary employer did not occur. *See Cuellar*, 731 F.3d at 345–46.[13] The record shows Penneti was already working for LTTS on a project in March 2020, and no evidence in the record shows LTTS recommended Penneti to Sonim in March 2020. Furthermore, "[t]he regulations permit, even expect, a secondary employer to rely on a primary employer to provide FMLA leave: a temporary employee's relationship with a secondary employer may end and never be restored without any violation of the FMLA." *Cuellar*, 731 F.3d at 347-48 (citing 29 C.F.R. § 825.106(e)). Thus, the regulations permit Sonim to rely on LTTS's decisions regarding Penneti's job restoration. *See Cuellar*, 731 F.3d at 347 (discussing secondary employer has having "no obligation to reinstate" a plaintiff asserting an FMLA interference claim and "that 'interference' requires something more to create liability against a secondary employer.").

---

[13] Penneti argues in his briefing that "[t]here is a fact issue as to whether LTTS actually asked Sonim if Penneti could rejoin the project. LTTS says it did. Sonim says it did not." (ECF No. 78 at 30). However, Penneti directs the Court to no corresponding evidence of such a fact issue, and the Court has found no such competent summary judgment evidence in the record.

---

MEMORANDUM OPINION AND ORDER

Second, there is no evidence that Sonim failed to comply with the "prohibited acts provisions" of 29 U.S.C. § 2615. *See Cuellar*, 731 F.3d at 345–46. Section 2615 prohibits the following:

(a) Interference with rights

(1) Exercise of rights
It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination
It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

(b) Interference with proceedings or inquiries
It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual—

(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter;

(2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or

(3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

29 U.S.C. § 2615.

Here, no evidence in the record shows Sonim knew of Penneti's FMLA request at any time *before* LTTS granted Penneti's FMLA leave request. There is no evidence in the record that Sonim participated in LTTS's process in determining Penneti's FMLA leave request. Thus, no evidence in the record shows (i) Sonim interfered with Penneti's exercise of rights or discriminated against Penneti under § 2615(a) or (ii) Sonim interfered with the proceedings and inquiries relating to Penneti's FMLA leave request under § 2615(b).

---

MEMORANDUM OPINION AND ORDER                                    Page **18** of 21

Even if the Court were to determine Penneti's FMLA claims against Sonim independently, Penneti's claims against Sonim fail. The above notwithstanding, Penneti's FMLA claims against Sonim are based on allegations of discrimination, retaliation, and interference. "To state a prima facie claim for discrimination or retaliation under the FMLA, the plaintiff must allege that **'(1)** he is protected under the FMLA; **(2)** he suffered an adverse employment decision; and either **(3a)** that the plaintiff was treated less favorably than an employee who had not requested leave under the FMLA; or **(3b)** the adverse decision was made because of the plaintiff's request for leave.'" *Hester v. Bell-Textron, Inc.*, 11 F.4th 301, 305 (5th Cir. 2021) (quoting *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998)) (emphasis added in bold); *see, e.g., Lanier v. Univ. of Texas Sw. Med. Ctr.*, 527 F. App'x 312, 317 (5th Cir. 2013) (addressing prima facie elements of FMLA retaliation claim). "A prima facie case of FMLA interference requires an employee to show that: **1)** he was an eligible employee; **2)** his employer was subject to FMLA requirements; **3)** he was entitled to leave; **4)** he gave proper notice of his intention to take FMLA leave; and **5)** his employer denied the benefits to which he was entitled under the FMLA." *Campos*, 10 F.4th at 526 (citation omitted) (emphasis added in bold).

At the outset, Penneti's briefing on his FMLA claims against Sonim is completely devoid of citations to evidence. (ECF No. 78 at 25-31). Regarding FMLA discrimination—as with the Court's determination on LTTS's motion for summary judgment—no evidence in the record shows Sonim treated Penneti less favorably than an employee who had not requested leave under the FMLA. Regarding an adverse employment decision in the FMLA retaliation context—as discussed in the Court's determination(s) on LTTS's motion for summary judgment—the record shows the end of the Sonim project assignment was not an adverse employment decision because Penneti continued employment with LTTS with the same salary and benefits. (ECF No. 82 at 12-

16). Indeed, the record contains evidence of only one adverse employment decision—Penneti's ultimate termination from work with LTTS. (ECF no. 82 at 12-16).[14]

No evidence in the record shows Penneti requested leave from or gave notice of intention to take FMLA leave to Sonim.[15] No evidence shows Sonim knew of Penneti's requested FMLA leave from LTTS until January 13, 2020—*after* LTTS granted leave. Thus, no evidence in the record exists as to these required elements (i) for Penneti's prima facie case(s) of discrimination or retaliation under the FMLA or (ii) for Penneti's FMLA interference claim. For the reasons above, the Court must GRANT Sonim's motion for summary judgment as to Penneti's discrimination, retaliation, and interference claims pleaded under the FMLA.[16]

## V.  CONCLUSION

For the reasons enumerated above, the Court GRANTS Sonim's motion for summary judgment on all of Penneti's claims against it.

(*Signature Page Follows*)

---

[14] No evidence in the record shows Sonim influenced or contributed to LTTS's reason for termination—as previously determined, LTTS terminated Penneti's employment because LTTS was not able to secure further work for Penneti.

[15] There is no evidence in the record that Sonim received or reviewed Penneti's FMLA leave request at any time. No evidence in the record shows Sonim received any notice of an unforeseeable need for leave FMLA notice—the minimum requirement of information sufficient to determine whether FMLA leave may apply. *See* 29 C.F.R. § 825.303(b) ("An employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request.") (providing examples). "Calling in "sick" without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act." 29 C.F.R. § 825.303(c).

[16] The Court pretermits any pretext analysis because neither Sonim nor Penneti brief pretext as applied to the claims in Sonim's motion for summary judgment.

---

**SO ORDERED.**

24th day of July, 2023.

ADA BROWN
UNITED STATES DISTRICT JUDGE